### WAYNE v. TEW.

(Court of Appeals of District of Columbia. Submitted January 17, 1923. Decided June 4, 1923.)

No. 1560.

Patents ⬅︎91(4)—Evidence held to show reasonable diligence in reducing invention to practice.

Evidence that the prior inventor was forced out of business about the time he conceived his invention, and was unable to induce others to advance the money necessary to construct a machine for applying the in-

vention, or to file an application for patent, *held* to show reasonable dili-
gence on his part in reducing it to practice, although he had in the mean-
time filed an application for another invention, which he testified he se-
lected as the first application, because he believed it would be easier to
obtain capital therewith than with the invention in interference.

Appeal from the Commissioner of Patents.

Interference proceeding between Herbert N. Wayne and James D.
Tew. From a decision of the Patent Office, awarding priority to Tew,.
Wayne appeals. Reversed.

Walter F. Rogers, of Washington, D. C., for appellant.

Robert M. Pierson, of Akron, Ohio, and Horace A. Dodge, of
Washington, D. C., for appellee.

Before SMYTH, Chief Justice, and ROBB, Associate Justice, and
SMITH, Judge of the United States Court of Customs Appeals.

SMITH, Acting Associate Justice. Whether priority of invention
for a method of making rubberized cord fabrics for use in the manu-
facture of pneumatic tires should be awarded to Herbert N. Wayne
or to James D. Tew is the issue raised by this appeal. Wayne filed his
application for a patent on the 15th of April, 1918, and Tew filed his
application on the 25th of July, 1918.

The Examiner of Interferences found that there was evidence tend-
ing to show that Wayne disclosed his invention to Dr. Hutchinson in
the early part of 1917, and that the evidence submitted on the inter-
ference proceedings satisfactorily established conception by Wayne
as early as July 15, 1917.

Tew testified and the testimony on his behalf shows that disclosure
of his invention was not made until late in September or early in Octo-
ber, 1917; that Tew, superintendent of the Pneumatic Tire Division
of the B. F. Goodrich Tire Company, and the junior party reduced the
invention to practice not later than January 8, 1918, does not seem to be
disputed, and the uncontradicted testimony tended to establish reduc-
tion to practice on the part of Tew as early as November 26, 1917.

As Wayne was the first to conceive the invention and the last to
reduce it to practice, the Examiner of Interferences held that it was
incumbent upon him to prove that between November, 1917, and his
filing date April 15, 1918, he exercised reasonable diligence in perfect-
ing the invention.

The Examiner of Interferences found that reasonable diligence was
not exercised by Wayne, and accordingly awarded priority to Tew.
From that ruling an appeal was taken to the Examiners in Chief, who
held that the evidence warranted a finding that Wayne did exercise
reasonable diligence to reduce his invention to practice. The decision
of the Examiner of Interferences was therefore reversed and priority
given to Wayne, the senior party. On appeal to the Commissioner,
the decision of the Examiners in Chief was reversed by the Assistant
Commissioner and from that decision this appeal was taken by Wayne.

Whether the evidence establishes that Wayne exercised that perse-
verance and reasonable diligence in reducing his invention to practice

and in giving the benefit of it to the public, which the circumstances surrounding him permitted, is the only real question in the case.

Wayne testified that in the early part of 1917 he kept a small retail tire store on Figuroa street, Los Angeles, Cal., and that in the first week of June, 1917, he was compelled to close its doors because of lack of money and the failure of his financial backer to make advances necessary for the business; that after closing his store and until April 15, 1918, he was out of employment, and, realizing that a man of his age had little chance of a salaried position, he devoted his efforts to the securing of financial backing which would enable him to put his invention to commercial use; that in May or June, 1917, he disclosed his conception to Dr. Hutchinson, Dr. Mabee, and others for the particular purpose of inducing them to finance the invention; that Dr. Hutchinson admitted that he was impressed with the merits of Wayne's idea, but told Wayne that the making of automobile tires and rubber work, was not in his or Dr. Mabee's line, and that therefore they could not let him have the money which he required; that later in July, 1917, with the object in view of securing the money to perfect and carry out his conception, he endeavored to interest N. N. Childers, and took Mr. Childers to the Compton Rubber Factory near Los Angeles, where he explained to Childers how much quicker was his method of making tire carcasses than was that of the company. Dr. Hutchinson corroborated Wayne as to the disclosure and the request directed to Dr. Mabee and himself for financial assistance to obtain a patent and suitable machinery for insulating the cords. Dr. Hutchinson testified that Dr. Mabee and himself declined to furnish any money for the reason that neither of them knew anything about rubber work or making tires. Childers testified that for a couple of weeks he endeavored to raise money to finance Wayne's idea, but that he finally gave up hope of helping Wayne financially and dropped the matter about the 1st of August, 1917.

Correspondence admitted in evidence proves that from November 13, 1917, to January 23, 1918, Wayne was engaged in negotiating with the Housatonic Machinery & Tool Company relative to the cost of a tire machine for his conception. The period from November 5, 1917, to November 13, 1917, and from January 23, 1918, down to April 15, 1918, therefore marks the time during which the activities of Wayne were suspended. He filed an application for an Armor cord tube, on the 29th of October, 1917. The filing of that application instead of the application in interference, Wayne explains, by stating that he had only money enough for the filing of one application, and that he could not file two applications, without using moneys absolutely necessary for household expenses. He admitted that he could have filed the application in interference, but that he elected to file the other, inasmuch as the tube for which he applied offered a better chance of obtaining financial backing than did the factory process covered by the interference application.

Unquestionably Tew, who was superintendent of the B. F. Goodrich Company and had charge of the manufacture of its cord tires, was

prompt in reducing his conception to practice. He had every facility to do so, and little or no excuse for delay.

Wayne, who first conceived the invention, was not so diligent as Tew, and could not well be, embarrassed as he was by the handicap that vexes nearly all mankind, lack of money when it is wanted. Wayne was compelled to close the doors of his little retail tire business for lack of funds, and just at the time when he needed money most he found himself with but little hope of employment and no means to reduce his invention to practice. He was far removed from the great manufacturing centers of the country, and from the capital which knowing something of the value of new conceptions might have been disposed to furnish the necessary moneys to make it a success.

Nevertheless, Wayne did not despair, and beyond question earnestly and conscientiously endeavored to interest his friends in his enterprise, and to secure from them the funds necessary to make application for a patent, and to obtain machinery for the manufacturing of the insulated cords which he required. But his friends knew nothing about the manufacture of tires or rubber work, and, as might have been expected, he did not succeed in inducing them to part with their money on the faith of his representations. Wayne then concluded that his factory process did not stand as good a chance of obtaining financial backing as would his armor cord tube, a commodity designed for general consumption. Apparently his reasoning proved to be correct, and he succeeded in borrowing sufficient money to file an application for a patent on the tube. Not being able to raise enough money to file two applications, the sensible thing to do was to file one application in the reasonable expectation that success with the filed application might enable him to afford the other.

The fact that he was compelled to make a choice as to which application he would file, and that he chose to file on the tube which offered the best chance of immediate financial returns, can hardly be regarded as lack of diligence in filing the application in interference, in view of the fact that he might reasonably expect that filing on the former would enable him to file on the latter. To hold that an inventor without funds must be as prompt in reducing his conception to practice as an inventor with every facility at his disposal would put the financially embarrassed inventor at a decided disadvantage, and make material means largely determinative of patent rights. We are not prepared to go that far.

We are of the opinion that the decision of the Examiners in Chief was sound, and that the decision appealed from should be reversed.